# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

March 11, 2020

**BY ECF & HAND DELIVERY**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street, Room 2240
New York, New York 10007

> Re:   **United States v. Richard Liriano**
>       **Docket No. 19 Cr. 796 (LAK)**

Dear Judge Kaplan:

Thirty-four year old Richard Liriano has lived with his parents for his entire life. Because he was raised in a high crime neighborhood in the Bronx, where both Liriano and his father were crime victims, his father did not allow him to go outside or maintain neighborhood friendships. Instead, his father escorted him home from school every day. PSR ¶ 49.

He graduated from high school in 2004 and earned an Associate Degree in Computer Network Operation in 2007. PSR ¶¶ 57-58. For about ten years he was employed as a support technician at the Hospital for Special Surgery, where he earned between $63,000 and $65,000 per year. Upon being fired for the offense conduct, he was employed by Two Sigma in user technology deployment but had to resign after his arrest since he was prohibited from using computers as a bad condition. PSR ¶¶ 60-61.

While troubleshooting on HSS computers, he obtained user names and passwords of HSS employees' personal accounts. Using this information he accessed employees' email and social media accounts where he searched and viewed nude images and sexually explicit videos of the employees. According to his statement to the FBI, he described his personal use as, "to do what people do when they view nude images" Exhibit A.

Honorable Lewis A. Kaplan                    Page 2
United States District Judge                 March 11, 2020
Southern District of New York

<u>Re</u>:  <u>**United States v. Richard Liriano**</u>
         <u>Docket No. 19 Cr. 796 (LAK)</u>

    In a voluntary confession made to HSS investigators a year
before he spoke to the FBI and was charged, he told HSS no
patient information was accessed. Exhibit B. There is no
evidence that he sought to extort the employees whose accounts
he accessed. Nor is there any evidence the images were posted.
Rather, the images were viewed solely by him.

**<u>Argument</u>**

    In selecting a sentence, this Court takes as its "lodestar
the parsimony clause of U.S. C. § 3553(a)." <u>United States v.
Douglas</u>, 713 F.3d 694, 700 (2d Cir. 2013). That provision
directs sentencing court to "impose a sentence sufficient, but
not greater than necessary, to comply with the factors set out
in 18 U.S.C. § 3553(a)(2)," namely, "proportionally, deterrence,
incapacitation, and rehabilitation." <u>Id. See also, e.g., United
States v. Ministro-Tapia</u>, 470 F.3d 137, 142 (2d Cir. 2006).

    "[D]istrict courts may impose sentence within statutory
limits based on appropriate consideration of all the factors
listed in § 3553(a)." <u>Pepper v. United States</u>, 132 S.Ct. 1229,
1241 (2011). The Guidelines range is one such factor, but it is
only one, and "the sentencing Guidelines are just that,
guidelines, and . . . 'they truly are advisory.'" <u>Douglas</u>, 713
F.3d at 700 (quoting <u>United States v. Cavera</u>, 550 F.3d 180, 189
(2d Cir. 2008) (en banc). If a district court finds two
sentences equally serve the purpose of § 3553, under the
parsimony command, it must impose the lower sentence. <u>Ministro-
Tapia</u>, 470 F.3d at 142.

    The critical sentencing question presented in this case is
the punishment that will be most effective in meeting the
sentencing goals of 18 U.S.C. § 3553(a). According to the
Sentencing Commission, alternatives to prison, such as a split
sentence, providing training/education and drug treatment often
are more effective in reducing recidivism than a straight prison
sentence. U.S.S.G., **Measuring Recidivism: The Criminal History
Computation of the Federal Sentencing Guidelines at p. 13,
Release 1 (May 2004).** That is especially so with low risk non-
violent offenders. According to one study, such offenders, who
spend less time in prison, were 4% less likely to recidivate
than low risk offenders who served longer sentences. Valerie
Wright, Sentencing Project, Deterrence in Criminal Justice:

Honorable Lewis A. Kaplan                     Page 3
United States District Judge                  March 11, 2020
Southern District of New York

Re:   **United States v. Richard Liriano**
      **Docket No. 19 Cr. 796 (LAK)**

Evaluating Certainty v. Severity Punishment 7 (2010), available
at http://www.senteningproject.org/doc/Deterrence%20Briefing%20.
pdf. According to the Sentencing Commission, an offender with no
criminal history points has a recidivism rate of 12.2 percent
and defendants with a probation sentence had a recidivsm rate
13.11. **Exhibit C**. Liriano has no criminial history points.

    The need to protect the public from future criminal
activity, to provide punishment and to provide specific
deterrence, § 3553(a)(2)(A)(B)(C), is adequately addressed by a
less severe sentence. Harsher punishment dos not generally
result deterrence. See also United States v. Beiermann, 599
F.Supp.2d. 1087, 1103-04 (N.D. Iowa 2009) ("Experience in other
criminal cases . . . surely does not support hope that harsh
sentences will end illegal activity . . . [T]he sentence should
not be longer simply to satisfy an objective that while
laudable, is not being achieved according to any empirical or
other evidence in this case, or for that matter, empirical
evidence in any other case or source that I am aware of.").

    And to protect the public from future criminal conduct,
both the absence of criminal history points and a post-high
school educational level result in the lowest likelihood of
reoffending. Exhibit C. Liriano has no prior criminal points and
has an Associate Degree. Thus, the Sentencing Commission's study
confirms what seems intuitive: a true first offenders presents a
strong candidate for a non-incarceratory sentence.

    As the result of his conviction, Liriano lost a job with a
good salary he had held for 10 years. He faces mandatory
restitution of $351,850. PSR ¶ 78. He has strong support from
his family and friends. Exhibit D. Aside from invading the
privacy of the victims, he did not seek to profit from his
illegal acts and did not distribute the images. A sentence of
probation in this case is sufficient to meet the Section 3553(a)
factors.

    As stated by Judge Gleeson, ". . . when a judge chooses
between a prison term and probation, she is not choosing between
punishment and no punishment . . . both are punishment." United
States v. Leitier, 2013 WL 753445 *15 (E.D.N.Y.).

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York

Page 4
March 11, 2020

    Re:  **United States v. Richard Liriano**
           **Docket No. 19 Cr. 796 (LAK)**

                  Respectfully submitted,

                    /s/

                  **PHILIP L. WEINSTEIN**
                  Assistant Federal Defender

cc: Jonathan Rebold
    Assistant United States Attorney

# EXHIBIT A

FD-302 (Rev. 5-8-10)

- 1 of 3 -

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD
Document participants have digitally signed. All signatures have been verified by a certified FBI information system.

Date of entry     12/13/2019

    RICHARD LIRIANO, date of birth January 9, 1986, was interviewed at the New York Office of the Federal Bureau of Investigation subsequent to his arrest at his residence, 1390 Franklin Ave, Apartment 2A, Bronx, NY 10456, on November 14, 2019. The following is a summary of the information LIRIANO provided and is not intended to be a verbatim account and does not memorialize all statements made during the interview. Communication by the parties in the interview room was electronically recorded and is maintained in ELSUR evidence. The recording captures the actual words spoken:

    LIRIANO was employed at the Hospital for Special Surgery (HSS) in 2008 as a desktop support "Tab 1" technician and later promoted to "Tab 2" with a higher salary but the same computer access privileges as before.

    While employed with HSS, LIRIANO obtained from the internet a software utility named "Hirens" that he found useful in troubleshooting computer problems reported to him by employees. This utility was not authorized by HSS but enabled him to more expeditiously resolve computer issues. The utility additionally came with software for "personal use" that included a password "check" which enabled him to see the usernames and passwords stored on the machines he worked on. LIRIANO would save this information to a "notepad" and then copy it to a USB drive for later use. The usernames and passwords permitted him to access internet web sites and social media accounts used by particular employees. LIRIANO's interest in doing so was to search for and view nude images and video the user kept in their email and social media accounts for his "personal use," that is, as he described it, "to do what people do when they view nude images." LIRIANO would use the password "check" feature of the tool if he found the user of the computer he was working on to be attractive. LIRIANO estimated that he accessed approximately 40 user accounts in this way. LIRIANO was only required to visit the employee's workstation if he was unable to resolve the issue over the telephone. Eventually, when HSS updated the Microsoft operating systems

---

Investigation on   11/14/2019   at   New York, New York, United States (In Person)

File #   288A-NY-3007085                                          Date drafted   12/06/2019

by   NUGENT BRIAN, BITTERMAN MATTHEW EDWARD

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

288A-NY-3C07085

(U) Post-arrest interview of Richard
Continuation of FD-302 of Liriano at the New York Office _____ , On 11/14/2019 , Page 2 of 3

installed on their computers, the "Hirens" utility no longer worked though LIRIANO was still able to use Chrome extensions and "key loggers," one was named "Keypass," to continue to obtain and use employees' usernames and passwords and access their accounts to look for nude content. LIRIANO estimated he used the "key logger" on approximately 30 workstations.

LIRIANO had administrative credentials which allowed him to login to user machines either in person or via a Virtual Private Network (VPN) connection he established between a desktop computer he had at home and his workstation at HSS. LIRIANO discovered images and videos of nude individuals or of sexual acts on about half of the user accounts he accessed. He recalled the names of some of his victims included SUE JAMIE GENAO, NILSA TAOBDOA (ph), and ALLISON ROSE.

LIRIANO logged into the VPN for legitimate purposes after hours but also to check the password logs that had been made due to the software he installed on the users' machines to access their personal accounts.

LIRIANO logged into Facebook accounts of HSS employees NILSA TAOBDOA(ph) and SUE JAMIE in the summer of 2019 because he remembered their passwords, to include their email passwords.

LIRIANO did not have the same access on computer workstations at his new employment, TWO SIGMA, as he had at HSS, due to a restriction on administrative priviledges, and was unable to install software.

LIRIANO used a content sharing forum called "VOID.TO" to obtain "leaked" usernames and passwords in the summer of 2019. The forum also contained pornography including child pornography though it was not his intent to view child pornography.

FD-302a (Rev. 5-8-10)

288A-NY-3007085

Continuation of FD-302 of (U) Post-arrest interview of Richard Liriano at the New York Office , On 11/14/2019 , Page 3 of 3

# EXHIBIT B



October 10, 2018

I am employed by Hospital for Special Surgery (HSS) as a Support Tech II. On September 27 – 28, 2018, I accessed an HSS employee's personal email and social media accounts, downloading pictures to my HSS workstation and personal computer (the Incident). My access to, and downloading of, private employee information violated HSS' Code of Conduct and "Acceptable Use of Hospital Information Systems, Computers and Networks" policy.

This voluntary statement confirms the following:

1. No patient information was accessed during the Incident.

2. All data accessed or downloaded during the Incident was deleted and none is stored on my personal computer or any cloud storage service to which I now have, or have ever had, access.

3. I voluntarily submitted my personal computer to Baker Hostetler, HSS' legal counsel and Business Associate, for forensic review and wipe of my hard drive.

4. Other than the HSS workstations assigned to me and my personal computer, which was used to log into the HSS workstations assigned to me, there are no other devices or cloud storage services through which I accessed, or on which I copied or stored/retained, information derived from, or related to, the Incident.

5. I have not made copies or screen captures of the information viewed during the Incident.

6. It is my current belief that I no longer have in my possession, and that I no longer have access to, any data derived from, or related to, the Incident. However, in the event HSS did not identify and/or remove all data from my possession, I confirm that I will not use or disclose such information. I will notify HSS immediately, in the event I become aware of any remaining data in my possession.

Signed: _Richard Liriano_ _____
          Richard Liriano

# EXHIBIT C



# Recidivism Among Federal Offenders: A Comprehensive Overview

UNITED STATES SENTENCING COMMISSION

UNITED STATES SENTENCING COMMISSION
ONE COLUMBUS CIRCLE, N.E.
WASHINGTON, DC 20002
WWW.USSC.GOV

**Patti B. Saris**
*Chair*

**Charles R. Breyer**
*Vice Chair*

**Dabney L. Friedrich**
*Commissioner*

**Rachel E. Barkow**
*Commissioner*

**William H. Pryor, Jr.**
*Commissioner*

**Michelle Morales**
*Ex Officio*

**J. Patricia Wilson Smoot**
*Ex Officio*

**Kenneth P. Cohen**
*Staff Director*

**Glenn R. Schmitt**
*Director*
*Office of Research and Data*

**March 2016**

## Reincarceration Rates Across Selected Variables

*Criminal History*

| | Total | N | % |
|---|---|---|---|
| **Total** | 25,431 | 6,266 | 24.6% |
| **Criminal History Category** | | | |
| CHC I | 13,581 | 1,897 | 14.0% |
| CHC II | 3,084 | 737 | 23.9% |
| CHC III | 3,616 | 1,189 | 32.9% |
| CHC IV | 1,996 | 868 | 43.5% |
| CHC V | 1,121 | 554 | 49.4% |
| CHC V | 1,923 | 986 | 51.3% |
| **Criminal History Points** | | | |
| 0 | 10,600 | 1,296 | 12.2% |
| 1 | 2,973 | 600 | 20.2% |
| 2 | 1,251 | 303 | 24.2% |
| 3 | 1,838 | 434 | 23.6% |
| 4 | 1,361 | 401 | 29.5% |
| 5 | 1,041 | 355 | 34.1% |
| 6 | 1,277 | 442 | 34.6% |
| 7 | 693 | 263 | 38.0% |
| 8 | 741 | 322 | 43.5% |
| 9 | 708 | 326 | 46.1% |
| 10 | 463 | 215 | 46.4% |
| More than 10 | 2,400 | 1,281 | 53.4% |
| **Career Offender/Armed Career Criminal Status** | | | |
| No Career Offender/Armed Career Criminal | 24,798 | 6,012 | 24.2% |
| Career Offender/Armed Career Criminal | 633 | 254 | 40.1% |

**Reincarceration Rates Across Selected Variables**

*Sentences Imposed*

| | Total | N | % |
|---|---|---|---|
| **Sentence Type** | | | |
| Probation | 4,754 | 624 | 13.1% |
| Prison | 20,575 | 5,620 | 27.3% |
| | | | |
| **Length of Sentence** | | | |
| Up to 6 Months | 1,048 | 169 | 16.1% |
| 6 to 11 Months | 762 | 180 | 23.6% |
| 12 to 23 Months | 3,655 | 1,015 | 27.8% |
| 24 to 59 Months | 8,023 | 2,293 | 28.6% |
| 60 to 119 Months | 4,552 | 1,283 | 28.2% |
| 120 Months or More | 2,521 | 676 | 26.8% |
| | | | |
| **Sentence Relative to the Guideline Range** | | | |
| Within Range | 15,680 | 4,021 | 25.6% |
| Above Range | 197 | 83 | 42.1% |
| 5K1.1 Departure | 5,112 | 1,132 | 22.1% |
| Other Government Sponsored Below Range | 520 | 137 | 26.4% |
| Non-Government Sponsored Below Range | 2,134 | 460 | 21.6% |
| | | | |
| **Length of Supervised Release** | | | |
| No Supervised Release | 121 | 35 | 28.9% |
| Less than 2 Years | 627 | 144 | 23.0% |
| 2 Years | 1,736 | 421 | 24.3% |
| 3 Years | 11,097 | 3,361 | 30.3% |
| 4 Years | 1,793 | 396 | 22.1% |
| 5 to 9 Years | 5,068 | 1,242 | 24.5% |
| 10 or More Years | 124 | 19 | 15.3% |

# Reconviction Rates Across Selected Variables

*Criminal History*

| | Total | N | % |
|---|---|---|---|
| **Total** | 25,431 | 8,062 | 31.7% |
| **Criminal History Category** | | | |
| CHC I | 13,581 | 2,701 | 19.9% |
| CHC II | 3,084 | 1,019 | 33.0% |
| CHC III | 3,616 | 1,494 | 41.3% |
| CHC IV | 1,996 | 1,030 | 51.6% |
| CHC V | 1,121 | 634 | 56.6% |
| CHC VI | 1,923 | 1,140 | 59.3% |
| **Criminal History Points** | | | |
| 0 | 10,600 | 1,844 | 17.4% |
| 1 | 2,973 | 856 | 28.8% |
| 2 | 1,251 | 432 | 34.5% |
| 3 | 1,838 | 587 | 31.9% |
| 4 | 1,361 | 530 | 38.9% |
| 5 | 1,041 | 435 | 41.8% |
| 6 | 1,277 | 543 | 42.5% |
| 7 | 693 | 320 | 46.2% |
| 8 | 741 | 385 | 52.0% |
| 9 | 708 | 377 | 53.3% |
| 10 | 463 | 246 | 53.1% |
| More than 10 | 2,400 | 1,473 | 61.4% |
| **Career Offender/Armed Career Criminal Status** | | | |
| No Career Offender/Armed Career Criminal | 24,798 | 7,761 | 31.3% |
| Career Offender/Armed Career Criminal | 633 | 301 | 47.6% |

Report-At-A-Glance
go.usa.gov/xNkNM



# Recidivism & Federal Sentencing Policy
*Recidivism of Federal Offenders: A Comprehensive Overview*

## Overview

The United States Sentencing Commission began studying recidivism of federal offenders nearly 30 years ago.[1] Knowing how often offenders reoffend and the types of crimes they commit can help policymakers determine how best to protect public safety, promote effective reentry techniques, and address overcapacity of the prisons. The Commission's most recent multi-year recidivism study is groundbreaking in both its breadth and duration, reporting the rearrest, reconviction, and reincarceration rates of more than 25,000 federal offenders over an eight-year period.[2] Below are some key findings from the first in a series of reports.

## Report Highlights

- Over an eight-year follow-up period, about half (49.3%) of federal offenders in the Commission's study were rearrested, almost one-third (31.7%) were reconvicted, and one-quarter (24.6%) were reincarcerated.

- Of those offenders who reoffended, most did so within the first two years of release (median time to rearrest = 21 months). For each subsequent year after release, fewer offenders were rearrested for the first time.

- About one-quarter (23.3%) of offenders who reoffended were rearrested for assault as their most serious charge followed by public order (15.5%), drug trafficking (11.5%), and larceny (7.7%) offenses.[3]

### Rearrest Rates of Offenders Over Eight-Year Period After Release



### Rearrest Rates of Offenders By Education Level



- A federal offender's age and criminal history were closely correlated with their likelihood of reoffending *(more on page 2)*.

- An offender's education level was also associated with their likelihood of reoffending. Offenders who did not complete high school were rearrested most often (60.4%) while college graduates were rearrested least often (19.1%).

- The type of federal crime that led to an offender's original conviction was also related to their likelihood of reoffending. Firearms offenders were most likely to be rearrested (68.3%) followed closely by robbery offenders (67.3%). Fraud offenders were least likely to be rearrested (34.2%).[4]

## Recidivism and Criminal History

Report-At-A-Glance
go.usa.gov/xNkNM

- To protect the public from further crimes of defendants, during the development of the criminal history guideline provisions in the mid-to-late1980s the Commission considered the relationship between offenders' prior criminal record and their likelihood of reoffending.[5]

- The Commission's recidivism study found that recidivism rates generally increase as offenders' criminal history calculations increase (thereby increasing an offender's sentencing range).[6] This finding confirms that the criminal history guideline provisions continue to work as designed.

### Recidivism Rates by Criminal History Category

| Criminal History Category | Category I | Category II | Category III | Category IV | Category V | Category VI |
|---|---|---|---|---|---|---|
| Rearrest Rate | 33.8% | 54.3% | 63.3% | 74.7% | 77.8% | 80.1% |
| Reconviction Rate | 19.9% | 33.0% | 41.3% | 51.6% | 56.6% | 59.3% |
| Reincarceration Rate | 14.0% | 23.9% | 32.9% | 43.5% | 49.4% | 51.3% |

## Recidivism and Age

- Studies have repeatedly shown older offenders to have a lower risk of reoffending[7] and the Commission's study confirmed this finding.  Just 16.0% of offenders older than 60 years of age at the time of release were rearrested.  In comparison, more than two-thirds (67.6%) of offenders younger than 21 at the time of release were rearrested.

- For each age group studied, the older the age group, the lower the rearrest rate.  The same trend holds true for both reconviction and reincarceration rates.[8]



**Rearrest Rates of Offenders by Age at Release**

| Age at Release | Rearrest Rate |
|---|---|
| LT 21 yrs | 67.6% |
| 21-25 yrs | 66.4% |
| 26-30 yrs | 62.2% |
| 31-35 yrs | 55.3% |
| 36-40 yrs | 48.8% |
| 41-50 yrs | 42.4% |
| 51-60 yrs | 24.7% |
| GT 60 yrs | 16.0% |

## More On This Topic

The Commission subsequently released two additional reports in its recidivism study series. The second report examines federal drug trafficking offenders.[9]  The third report further analyzes the relationship between offenders' criminal history guideline calculations and their likelihood of reoffending.[10]

Endnotes

1. See Supplementary Report on the Initial Sentencing Guidelines and Policy Statements (1987), https://go.usa.gov/xNkN7.

2. The study cohort is comprised of 25,431 federal offenders who were U.S. citizens and re-entered the community during 2005 after discharging their sentence of incarceration or by commencing a term of probation in 2005.

3. For more on offenders' most serious recidivism offenses, see page 17 of the full report.

4. A full list rearrest rates by offense type is available on page 20 of the full report.

5. See U.S. Sentencing Comm'n, Guidelines Manual (2016), Chapter 4, Part A, introductory commentary.

6. For a similar analysis by criminal history points, see page 18 of the full report.

7. See note 56 of the full report.

8. See Appendices A-2 and A-3 of the full report for reconviction and reincarceration rates.

9. Louis Reedt, et al., U.S. Sentencing Comm'n, Recidivism and Federal Drug Trafficking Offenders (2017), https://go.usa.gov/xNkNH.

10. Tracey Kyckelhahn and Trishia Cooper, U.S. Sentencing Comm'n, The Past Predicts the Future: Criminal History and Recidivism (2017), https://go.usa.gov/ xNkN6.

SOURCE: United States Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05.

www.ussc.gov
pubaffairs@ussc.gov
@theusscgov



# EXHIBIT D

## Letter for Richard Liriano

Hello,

My name is Anthony Linval and I worked with Richard Liriano. We are colleagues and friends. I am deeply sad to hear the events that is happening to him at this moment, Richard is good man and friend to me. Richard is one of those friends that I can relate to when comes to our hobbies in video games. I first met in Rich in 2013. I just started working in IT and learn how everything works at jobsite. Rich was one who trained me, He showed me everything worked there. One day I notice he was into video games when he was on a website that I visit online. Since then we became good friends and talked video games and Anime.

Rich and I would go out to eat and go movies we were good friends but there was times Rich kept to himself like he was a bit anti-social with people. I figure Rich was anti-social and choose his friends he would to socialize with. He socialized with everyone in our team, he was our hardware guy because of his previous job. He is very smart when came to computer hardware. He helped me build my second computer when we worked together.

When I heard about Rich involvement with this incident, I could not believe it. I could not understand the reason for his actions. I realize Rich needed help and he had made a mistake, a mistake that changed his life forever. Rich getting arrested after the incident bothered me very much. He had already lost his job and was trying to start over. Rich getting arrested was one or many of victim trying to cash out on this incident and it isn't right. I don't believe he stole or hurt anyone of the victims. Rich was very apologetic to me and his fellow team members.

I would not like to see Richard go to prison for a mistake that cost him his career. He should do community service, to pay for his crime. I would like to volunteer myself as well to help him and his family. Rich lives with mom and dad, they both depends on him with many everyday needs.

Richard Liriano is not dangerous to anyone, believe me. Rich wants to live his to fullest and happy with his family. Please give him a second chance in life. He is a good man and friend.

Anthony Linval / 02/11/2020

02/11/2020

To the Honorable United States District Judge Lewis A. Kaplan,

My name is Chi on Chan, I am a friend of Richard Liriano. I met Richard when I started my job at the hospital, he was the most technical person within the team. I was impressed with his dedication in completing the task at hand whether if he had to come in early or stay late. Richard was always reliable in terms of assisting colleagues and barely ever calling out unless he is really sick. In my opinion he is an easy-going and dependable person when things needed to get done. Aside from being colleagues, we often chat about the games we played and brainstorm on how to improve or advance in them. What he did came as a huge shock for me and I hope he gets the help he needs after serving his time. Once Richard is out, I'll be there to lend a helping hand, whether to find a new job or just to chat. He is a good friend and I have always enjoyed his company.

Chi on Chan

1-27-2020

My name is sargent Elisandro cruz brother in Law
of Richard LIRIANO. I know Richard about
12 years and I have only known good things about
him. He never being in any problem before.
I would like to let you know that he is
a responsible man and a good brother in Law
always there for anyone who need his help.
I would like to ask a second chance for Richard.
I know that he dont be in trouble again.

Sincerely

646-886-8576

January 20 2020

Dear Honorable Judge,

 I am Richard Liriano's sister from our father's side. I lived mostly in the Dominican Republic. I have been in the states for 3 years and have never heard any bad news regarding my brother.I would like to say that Richard is very loved by his family and is a great person. Richard is mostly home with his parents and loves gaming. He is never in the streets causing or looking for trouble. This news has taken me by surprise as he is such a responsible person. Honorable Judge, please give my brother another chance to continue being the great person he is.

Sincerely,.

Jocelyn Liriano Rosa

917-601-9060

January 20 2020

Dear Honorable Judge,

 I am the father of Richard Liriano, When law enforcement came to my home looking for my son, I was very surprised because I would never think that this would happen to our family. My son never gave me any problems. He has always been a hard working responsible person. Richard has never caused any trouble growing up he was always great in school. After highschool he went straight to college and once he graduated he went straight into building his career. Since this situation has come about I am unable to sleep worried about my son because I know he is a great son.

Honorable Judge I am asking that you give my son a second chance to continue being the great person he is.

Sincerely,

Juan Maria Liriano Sr.

929-404-1361
718-542-2152

January 20 2020

Dear Honorable Judge,

 My name is Madeline Regalado niece of Richard Liriano, Richard and I are very close in age and even though he is my uncle, he is also like a big brother to me. We grew up together under the same roof for sometime during childhood and I have an immense respect for him. Richard is a very family oriented and caring person. In all the years of knowing him, I have seen him grow into an intelligent responsible man. Richard has always followed rules, he dedicated himself to his education and goals. He was very successful in accomplishing his goals in his career path. Richard has always looked and cared after his parents and loves his family very much. Richard is there for anyone in need, including my brother, taking him under his wing a being a mentor for him. Richard has always set an example for my myself and our family. Richard has always walked in a straight path and was never in trouble with the law. I am confident that the court will see what a great person he is. Richard's family is here to support him in this time of need as he would be for us.

 Honorable Judge, I hope that you will consider our families testimony before the court, and give Richard second chance.

Sincerely,

Madeline Regalado

646 - 553 - 0196

January 20 2020

Dear Honorable Judge,

 I am the mother of Richard Liriano, When the detectives came to my home
looking for my son, I was scared and shocked. My son has always been there
for me and his father always working hard to support us. You can only imagine
that this situation as his mother has broken my heart. I am unable to sleep at
night and sometimes wake up in fear that my son will be taken away from me.
My son is a loving,kind and generous person. Richard was a my "golden child"
always excelling in school and making us proud. Richard is a responsible hard
working man who is always there for his family and friends.


Please Honorable Judge I am asking that you give my son a second chance to
continue being the great person he has always been.


Sincerely,
Patria Liriano Santo
716-542-2151

February 10, 2020

To the Honorable Lewis A. Kaplan

United States District Judge


RE: Richard Liriano

Dear Judge Kaplan,

My name is Dale Chin. I am a Senior IT Desktop Project Specialist at the Hospital for Special Surgery in New York City and have been employed there for 22 years. I have two degrees in Mechanical Engineering from the Cooper Union.

I have known Richard, in a mostly professional capacity, for all his 9 years at the hospital as a user support tech, until he was let go in October of 2018. He worked on technical projects under me in the IT User Support Division. I have found him to be one of the best co-workers in our department. He is very competent technically and is a tireless worker, many times volunteering to stay late or come in early to work on projects that have gone overtime or required an early start. I have observed him to be very good with the users, in terms of following up with them and explaining/resolving computer issues with them in a professional manner. When we hired Richard, he already had all the above qualities ingrained in him, which was uncommon for someone in their early twenties and a godsend for us. Richard has acted as a mentor to newly hired techs and collaborated with the computer analysts in our department on clinical/financial applications, for installation and general troubleshooting. Losing Richard created a large manpower and technical gap in our group that still has not been adequately filled.  Richard was a valuable member of our team and easily worth two techs.

With regards to his personal side, Richard is a typical geeky individual who loves all things electronic, from game consoles to the latest smartphones, and of course, computers.  He keeps up with all the latest technical news and has taken advantage of the technical courses offered by our department. He still has two friends at the hospital that he associates with and who are also user support techs themselves. He lives with his parents who are older than normal, more like "grandparents" as he was born late in their lives, and this has resulted in a large age gap between him and his siblings. Richard is the default caregiver in his family for his parents and would take days off to escort them to doctor's appointments and hospital surgeries.

I see in Richard a young man of great potential for good despite his faults, his skepticisms, and his doubts about his own future. I believe that with rehabilitation and the support of his friends and colleagues, Richard can come back to society and continue to serve as a valuable and contributing individual, and perhaps in time maturing to be an even better person.

Sincerely,

Dale Chin

Dale Chin